I appreciate your being here twice undergoing all of the giving us the business two times. Go ahead, counsel. Good morning, members of the court. My name is Joel Friedman. I represent Deborah Morales, the plaintiff in this case. I'd like to reserve two minutes for rebuttal. The issue here is whether the administrative law judge both factually and legally decided this case correctly. Since my brief... But the real underlying issue is, is there substantial evidence in this record, correct? Correct. And we have to look at exactly what the ALJ decided here, and that is that Ms. Morales' admittedly disabling medical problems resolved within 12 months. We have to look at what evidence the ALJ cited for his decision that her medical condition had, in fact, resolved within 12 months. There are some legal questions. There are some questions about the sufficiency of the record. There's an issue about the absence of a specific statement from a physician, one of Ms. Morales' doctors, that she was disabled or not disabled. I would refer the court... But aren't we really looking? The IJ said three things. Number one, he said there's evidence of medical improvement. There's an absence of any medical evidence saying that she is disabled. And looking at the opinion of the state agency physicians, that's where we're going. And you're suggesting that, given those findings, that I have to find that there's no substantial evidence in this record doing that. And what you're really looking at is that it seems as if the IJ has rejected the claimant's testimony. That's a major part of it. The other two parts really beg the question presented by the facts. The administrative law judge decided that Ms. Morales had improved. What's the evidence, though, of her condition between December 2001 and December 2002? That evidence shows exactly the same diagnoses. That evidence shows exactly the same kidney abnormalities and exactly the same complaints. This is not a pain case. This is a fatigue case. And Judge Hug wrote the decision in Reddick, which was a chronic fatigue syndrome case. It is the jurisprudence in this court on non-pain cases. Lingenfelter is what I understand to be the most recent Ninth Circuit published opinion on a Social Security claim. And it restates established legal standards. Those legal standards that this court is being asked to look at is that the ALJ has to look at all of the evidence. The ALJ cannot select pieces of the record. And the record includes Ms. Morales's the accepted standard that the court defers to the ALJ's findings of medical improvement. I would disagree that that is the standard in the Ninth Circuit. The standard in the Ninth Circuit is this court has to look at the entire record. The court cannot isolate only that evidence that supports the judge's decision or purports to support it, but also has to look at the evidence that is contrary to the ALJ decision. That's correct. But if we find that the ALJ's decision is sustained by substantial evidence, that's less than a preponderance, what a reasonable person may use to support the conclusion, then we can find that the ALJ has made an appropriate decision. Isn't that correct? That's not entirely correct. Even if the ALJ decision can be deemed supported by the evidence, the court also has to look at the ALJ's legal conduct. And the case there is Howard, X. Rel. Howard. I apologize, but that's another Judge Hugg case. And I would refer the court to a Seventh Circuit decision that Judge Mills is probably familiar with, the Sarchette. And it was cited in a case that, from what I can tell, Judge Mills was the author, but he wasn't on the panel. So I don't know how that worked. And I'm reluctant to cite it by name because it's unpublished. But Sarchette says, if, while there's enough evidence... It's like I'm the only one who hasn't done a case you can cite. I'm going to get to you. Oh, you are? Okay. I think he just went down the computer and punched in Mills. Every time he cites something, he gets Hugg on there. I thought we'd better just go into conference and say, okay, Hugg, what are we going to do? But the bottom line is that I have to find if there's substantial evidence. Now, that, to me, given that it's got to be more than a scintilla and less than a preponderance, and I know that I can't just look at what's in there that helps him, I've got to look at the whole, but I've still got to find some substantial evidence. Tell me, I mean, looking at this record, tell me, he outlined exactly what the decision was and why. He put it there, and yes, it isn't the total, it isn't certainly, I wouldn't even say preponderance, but I don't have to have a preponderance. So why haven't we got it? Because we have nothing that shows that Ms. Morales' chronic renal insufficiency, that her nephrotic range proteinuria, which is excess levels of protein in urine, from her diabetes, from her chronic renal insufficiency, had changed. There's no objective evidence that it had changed. There is a statement from a medical consultant, Dr. Hopkins, never saw Ms. Morales, never examined her, reviewed the records. The document that Dr. Hopkins completed makes no reference to any evidence that he may have reviewed, no evidence that he relied on. His document was completed in February 2003. If we just look at the timing, that's more than 12 months. So let's assume for the moment that Dr. Hopkins accurately defined Ms. Morales' condition in February 2003, that at that point she had recovered. Then she was disabled, ostensibly, during the 14 months prior to that. The ALJ decisionary member is that the evidence showed Ms. Morales had recovered sufficiently to go back to work within 12 months. Well, but if I look at the evidence, there's one report, Dr. Ferrero's January 2003 examination, which is what the ALJ levels in on. I mean, he cites more than that. He talks about a weight loss, and he talks about she's feeling well and all of that. But right there in that report, Dr. Ferrero suggests no change, her blood sugar levels did improve by dropping out of the range. Her levels merely settled into the high 200 to low 300, which to me is pretty high. But Dr. Ferrero says the diabetes was much better than the last time. Further control was required in order to halt the progression. He also said that her glucose control has still remained a problem. Dr. Ferrero did not say that Ms. Morales' chronic renal insufficiency had changed, only that the blood sugar level, which if it remained in the 400, 500 range, was certain to continue aggravating her renal insufficiency. Getting her blood sugar under control, which had not been accomplished in January, and if you look at the July 2003 note that you were referring to, she did say she was feeling well, but her blood sugars were back up over 300. Dr. Erwin Schroeder What about her testimony? You haven't mentioned that. Dr. Michael McCloud Her testimony focused on fatigue. Her testimony was consistent with the reports that she had given. It was consistent with her report to Dr. McCloud, her primary care physician, that she was having problems with fatigue. Her testimony, the ALJ asked her, are you tired? He led her to the question. Are you tired? Does your mother have to help with the children? That's at page 144 of the excerpt. She described that everything took longer. She could do it. Housework, child care, she later. Two years later. If you look at the records, what did the ALJ do with her testimony? Did he give it credit? Dr. Michael McCloud He really didn't say anything. And that's my point, that even if there is evidence that seems to say he made a decision factually correct, the law requires the ALJ to make specific, clear and convincing findings on the credibility issue. If Ms. Morales' testimony was credible, then the ALJ's finding that she had improved goes away. And the judge's credibility assessment is two lines, excuse me, two sentences on page 22 of the excerpt. Justice Breyer Correct. Saying what? Dr. Michael McCloud Saying in a very circular argument that because he found that she had Justice Breyer I mean, I appreciate you want to characterize it, but just say what she said. What he said. Dr. Michael McCloud Does not find her fully credible because of medical improvement, clear evidence of medical improvement. Is there clear evidence of medical improvement? No, there is not. The absence of any medical source of record. If you look at the cases where judges disregarded statements from doctors that a person was disabled, the pattern in practice is judges don't credit statements from doctors that my patient is disabled. That's not really appropriate. And I wouldn't, I don't practice that way administratively. The third thing is Dr. Hopkins said Justice Breyer Just a minute. That's beyond the scope of the question. I think you're through. Your time is up. Thank you. Dr. Jeanne M. Turk Your Honors, my name is Jeanne M. Turk. I'm here representing the Appellee, Commissioner of Social Security, Michael J. Astro. Mr. Turk, let me ask, is there any evidence here of improvement in her renal disease? That supposition can be reasonably drawn from the record, Your Honor. This claimant is rather young, 28 years old at the time of her alleged onset. She has two disorders, high blood pressure and diabetes. Both have been shown to be amenable to treatment. She became pregnant and complications set in. She was treated during that period of time from about December until July of 2002. She was hospitalized. After that, as Dr. O'Farrell says, she became asymptomatic. This is evidence that her two conditions are amenable to treatment. After July 2002, there were no further hospitalizations. She was not admitted to the emergency room. Her treatment consisted of changes in her medication and, notably, constant reminders about her dietary needs and her compliance with medication. I'll tell you what bothers me. Here is a woman who has a whole lot of things wrong. And she testified about what effect that's having on her, that she can't sit or stand for very long. Throughout this time, although it improved somewhat and then it would go back to not being good, throughout all this time, if you believe her, she's got some real serious problems that have some very serious effects on what she can do around the home, anywhere else. She has to sit with her legs elevated or otherwise they swell. What do we do about that? Why isn't that credited? It has been credited, Your Honor. Unless the ALJ believed claimant's subjective complaints, the ALJ would not have been able to accept the state agency physician's finding that plaintiff was capable of sedentary work. Plaintiff said that she had no problem sitting, Your Honor, consistent with sedentary work. She said that she could not sit too long or legs swell. I don't recall that, Your Honor. I do recall some mention that she stands up for a few minutes and then can sit down. But I believe she said no problems with sitting. She said she could stand or walk for approximately 10 to 15 minutes. This is consistent with the ALJ's RFC finding and the state physician. She said she had no problem reaching Your view is that she can sit for, say, a full eight hours. She can sit commensurate with the requirements of sedentary work. The ALJ Well, what is that? That she can sit for up to six hours, that she could stand and walk up to two hours, that she would lift, and again, this is consistent with her subjective complaints, that she could lift up to 10 pounds. My worry is this, counsel. It seems to me that the ALJ rejected her testimony. Would you agree? No, I would not, Your Honor. Well, I don't know what deference he gave to it. It seems to me, then, if he rejected her testimony, he can only do that for clear and convincing reasons. And looking at this record, I'm having a tough time about the clear and convincing. Your Honor, the ALJ did not reject her subjective complaints regarding her lifting requirements, her ability to sit, and her ability to walk. About the only thing that the ALJ was concerned about was her subjective complaint that she could not work. And for that, the ALJ looked to the medical opinions. There is not, in three years of medical notes, there is not one indication from her treating physician that she was stable. Well, he had a one-sentence, a one-sentence RFC analysis, and that was merely a reiteration of Dr. Hopkins' checklist. Your Honor, if the ALJ did not believe plaintiff's claimant's subjective complaints, then he would have had to either rejected her complaints or rejected, for example, if the state agency had said she could do light work, the ALJ would then have She could be a receptionist again. She could be a receptionist, and that is consistent with her testimony. I think that's her statement on, I believe it's the excerpts of record, page 54. She said she sat as a receptionist. Need to look a little more clearly at that evidence, Your Honor. The ALJ had said that she performed it at a heavy exertional. She actually performed it at a medium. She said she sat. She didn't say she walked or stood. She sat at that job. That's at the excerpts of record 54. That is consistent with the RFC finding by the ALJ, and it's also consistent with the definition of the requirements of receptionist found in the Dictionary of Occupational Title. Was it that he didn't find was convincing in her testimony? What didn't he find was convincing? Did he find in her testimony that was not clear and convincing? I believe, Your Honor, that he accepted her subjective complaints. Entirely, yeah. Well, except for the fact that she could not work. To that he looked at He said not entirely credible. Because of that, Your Honor, that based on her own stated limitations, that she felt she couldn't work with those limitations, but the state agency physician who is credited with analyzing disability cases found that she could perform sedentary work. The ALJ believed her statements regarding that. This is Dr. Hopkins that checked the list, only checked squares, and didn't examine her, didn't really look through the record, I don't think. No, he did not. But, Your Honor, his findings were consistent with the medical record. As I said, she had two disorders that were amenable to treatment. After receiving the treatment in July of 2002, her entire treatment consisted of changes in her medication. None of her doctors in three years ever stated that she was disabled, let alone had any functional limitations. And there are several physical examinations. I think your posting counsel makes a good point on a statement about a conclusion that she's disabled. We generally ignore that, because it's conclusory. What we're interested in is the facts. And so the fact that he didn't say a conclusion that she's disabled, I don't think that really affects us. But it is some evidence, Your Honor, to go three years, and again, her treating physician never even stated a functional limitation. These types of conditions, as I say, was amenable to treatment. It was worsened during the period when she was pregnant. And as I stated, in July of 2002, after being treated in the hospital, about a week later, Dr. Farrell says she's asymptomatic. Now her condition persisted, but in terms of the functional limitations, there were none. There are none in this record, except that the state agency physician determined that a claimant could perform sedentary work. The ALJ looked at that decision, looked at claimant's testimony, and determined that, yes, indeed, they were consistent with each other. Otherwise, the ALJ would have had to have discredited the state agency physician or have discredited the claimant's testimony. In this case, the ALJ accepted the testimony, except for the fact that she was disabled. And he looked to the medical evidence for that and found nothing from her treating physician. I've got to say that Dr. Hopkins' analysis of the whole thing is not very credible. He didn't, never examined her, didn't look through her records, just checked blocks, and didn't even put the final sample on it. Well, Your Honor, he is credible. He's one of our experts, agency experts. And if we look at his residual capacity finding ñ Well, the fact that he's one of your agency experts doesn't do a lot for me. What I'm interested in is what he decided in this case. And it looked like he just kind of went through and checked some blocks on a form. Well, yes, indeed. He did check boxes. But he did make, he did base those, his opinion on claimant's diagnosis of diabetes, sorry, neuropathy. And he did, he did base his opinion and again noted her pregnancy, noted her diabetes was poorly controlled, and noted obesity. So the, I don't believe that there's any evidence to say that the state agency physician did not look at the entire record and that the decision has no credibility, the opinion rather has no credibility. I'd like to close. In fact, in fact, what is the standard of review when looking at these, at this report for which someone doesn't say very much about? Isn't there a standard on the opinion of the state agency physician? Isn't that standard the only time it can be used is when it's consistent with independent clinical findings or other evidence? Absolutely, Your Honor. And it was consistent with the claimant's testimony. Was that raised below? Come again? I'm sorry, Your Honor. Was that issue even raised below? Whether the state agency physician's opinion was consistent with the record? Correct. I don't believe so. The Well, that was something that was, I mean, we talked to counsel a long time about another issue, but my worry was that not consistent with independent clinical findings, I couldn't find that that had even been argued below. Well, Your Honor, in fact, it is consistent with independent clinical findings. The state agency physician looked at plaintiff's, looked at claimant's medical records. Again, she, her condition was amenable to control. She was hospitalized two times during the course of her pregnancy. After she delivered, she was never again seen in the hospital or ER about compliance with that medication and following a proper diet. Thank you, counsel. Thank you, Your Honors. Appreciate your time. I think you're out of time. No, I'd like to hear a little bit. Oh, you want to hear? Yeah. All right. You've got a minute. Saved by the bell. For 90 seconds. We're now on Judge Huggs' nickel. Yeah. What I want to know You did save some time. 77 seconds. All right. Yeah. What I want to know that you could address is that what her testimony is as to her limitations. There seems to be some disparity between the two of you. Ms. Morales never testified that she could not work. She testified about her ability to perform household activities, and she did not ever testify that she could sit. She, in fact, testified that she had to lie flat because of her LASIKs diuretic therapy with her legs elevated. She testified that if she did not lie down with her legs elevated during the day, her legs swelled, and if she did not lie down during the day with her legs elevated, she was up all night using the restroom. That's on page 151 of the excerpt of records. Dr. Hopkins is not an expert. He's a cardiologist and geriatric physician. He is not a kidney specialist. There is no foundation for his opinion. Is there one medical record even mentioned in his entire seven or eight page document? No, there is not. Quickly on the receptionist issue, this was addressed in the briefs. Ms. Morales was not a receptionist. That's a legal issue that has been pushed to the side. I would ask the committees, under Ninth Circuit case law, you cannot parse out the job. The case that I would like the court to look at Are we really talking about Judge Hugg's question? I'm sorry. I think you're through. Well, her testimony was that she could not sit for long periods of time, that she could not do anything for long periods of time because she was tired, fatigued, had diminished energy, did not have stamina, because of her chronic renal insufficiency, her nephrotic range proteinuria, and her anemia, which Dr. Hopkins did not mention in his short list. Can I ask one question? Thank you very much, counsel. Thank you. ASO 616858, Deborah Morales v. Michael Estrue, is submitted.
judges: Hug, Smith, Mills